IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., *et al.*, | )<br>)  CASE NO.  1:09 CV 588<br>) |
| Plaintiffs, | )<br>) |
| v. | )  JUDGE DONALD C. NUGENT<br>) |
| UNITED STATES ARMY CORP OF ENGINEERS, *et al.*, | )<br>)<br>)  <u>MEMORANDUM OPINION</u> |
| Defendants. | )  <u>AND ORDER</u><br>) |

This matter is before the Court on the parties' cross motions for summary judgment. (ECF # 19, 21). The Plaintiffs in this case seek a judgment invalidating a Clean Water Act §404 permit that the United States Army Corps of Engineers ("the Corps") granted to Ohio River Clean Fuels, LLC ("ORCF" or "Applicant") to build a coal-to-liquid fuel plant ("plant" or "facility"). Plaintiffs claim the Corps violated the National Environmental Policy Act ("NEPA"), the Administrative Procedure Act ("APA"), and the Clean Water Act ("CWA") in determining that the permit should be granted. They seek to have the permit revoked. The Defendants counter that the Corps complied with the requirements of NEPA, the APA, and the Clean Water Act in issuing the permit. Defendants seek a judgment dismissing all of the Plaintiffs' claims.

**PROCEDURAL HISTORY/STATEMENT OF FACTS**[1]

A company called Ohio River Clean Fuels, LLC, owned by Baard Energy, sought a permit allowing it to fill 5,897 linear feet of streams and 0.17 acres of wetlands, and to temporarily impact 793 linear feet of streams and 0.02 acres of wetlands, in order to build a coal-to-liquid fuel plant on a 662-acre parcel of land southwest of Wellsville, Ohio.  (Pl. Ex. 1(AR)[2] 23-24).  The entire site contains 1.62 acres of wetlands, 2.33 acres of ponds, and 27,169 feet of stream channels that the Corps determined were "waters of the United States" subject to its permitting jurisdiction.  (AR 24).  If constructed and operated, the plant is expected to use 28,000 tons per day of coal to produce 52,000 barrels per day of liquid fuel and supply 250 megawatts of electricity to the grid.  (AR 25, 50-51).

On January 8, 2008, the Corps issued a Public Notice of ORCF's application for the permit.  (AR 31, 85-87).  Four written comments were received during the thirty day public comment period; those comments were reviewed and considered by the Corps in its evaluation of the permit request.  (AR 57-59, 1705026, 1731-43).  The Plaintiffs did not timely submit any written comments to the application.  (AR 1744-1898).[3]  On April 17, 2008, the Corps attended an Ohio Environmental Protection Agency ("OEPA") public hearing on the proposed facility.

---

[1] There is no dispute as to the material facts at issue in this case.  The case is an appeal of an administrative decision, and the facts are limited to those facts contained in the administrative record.

[2] Plaintiffs' Exhibit 1(A-K) contains portions of the Administrative Record.  Both parties cite this Exhibit as "AR", and to avoid confusion, the Court will also adopt this citation format.

[3] Plaintiff NRDC did eventually submit comments, but not until four months after the comment period had closed.  (AR 1744-1898).

(AR 59, 31). Only two individuals, including one representing Plaintiff Sierra Club, testified in opposition to the facility. (AR 59, 31). Neither of those individuals "provide[d] reasons for their objections." Plaintiff NRDC did not voice any objections at the hearing. (AR 59).

By the time the Corps was evaluating ORCF's permit application, ORCF had or was expected to receive all of the necessary state and local authorizations to proceed with the facility, including a National Pollution Discharge Elimination System water permit, a Water Quality Certification, and an air pollution Permit to Install, each issued by the OEPA. (AR 22-23, 35-37, 44-46, 51, 57, 1456-74, 2876-2902). The Corps determined that NEPA did not require it to prepare an Environmental Impact Statement ("EIS") prior to issuing the permit.

Under the NEPA, the Corps determined that "the permit action will not have significant adverse effects on the quality of the human environment." (AR 31-56, 61). Under the CWA, the Corps determined that ORCF's proposed alternative represented the "Least Environmentally Damaging Practicable Alternative," and that the issuance of the permit would not be contrary to the public interest. (AR 31-56, 61). The Corps signed its decision authorizing the permit on November 7, 2008, and executed the permit on November 19, 2008. (AR 1-10, 62).

## STANDARD OF REVIEW

The Court's review of the Corp's decision is governed by the APA, 5 U.S.C.§§ 701-706. A court's review of the agency's decision is highly deferential, and the Court must presume the validity of agency actions, unless it finds that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A); see also, *Michigan v. Thomas*, 805 F.2d 176, 181-182 (6th Cir. 1986); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). A decision may be considered arbitrary and capricious if it "entirely

fail[s] to consider an important aspect of the problem" or "offer[s] an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*, 463 U.S. 29, 43 (1983). In contrast, a Court must find in favor of the agency if the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983). On review, a Court may consider whether the Corps followed "required procedures, evaluated relevant factors and reached a reasoned decision," but it may not substitute its judgment for that of the agency. *Van Abbema v. Fornell*, 807 F.2d 633, 636 (7th Cir. 1986); *see also, Overton Park*, 401 U.S. at 416.

## **ANALYSIS**

### I. **Alleged Violations of the National Environmental Policy Act**

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, addresses the necessary procedures that an agency must follow when evaluating the potential environmental effects of a proposed federal agency action. It does not impose substantive obligations, nor does it dictate any particular course of action or particular results that should be achieved as a result of any agency action. *See March v. Oregon, Natural Res. Council*, 490 U.S. 360, 371 (1989); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-351(1989). NEPA requires that an agency "collect and disseminate information about the environmental consequences of proposed actions that fall under [its] respective jurisdiction." *Sw. Williamson County Cmty. Ass'n v. Slater*, 243 F.3d 270, 278 (6th Cir. 2001). The statute is meant to ensure that an agency's decision is informed; it provides no basis for judgment as to whether an

informed decision is also correct or wise. *See, Methow Valley Citizens Council*, 490 U.S. at 351.

Several regulations adopted in support of the NEPA statute govern the Corp's review of the permit application at issue in this case. The Council on Environmental Quality ("CEQ") promulgated regulations for applying NEPA. These are set forth in 40 C.F.R. §§1500-1508. In addition, the Corps promulgated its own regulations pursuant to NEPA at 33 C.F.R. Parts 230 and 325, Appendix B.

To apply NEPA, the Corps must first define the federal action[4] subject to review. 40 C.F.R. §1508.18. To help define the scope of the action, the Corps may prepare an environmental assessment ("EA"), taking into account the direct, indirect, and cumulative environmental effects of the proposed action.[5] 33 C.F.R. §230.10; 40 C.F.R. §1501.3; see also, 40 C.F.R. §§ 1502.16, 1508.8-9. If the action is deemed to be a major federal action significantly affecting the quality of the human environment, the Corps must then prepare an Environmental Impact Statement ("EIS"). 42 U.S.C. §4332(2)©; *Marsh*, 490 U.S. at 371; *see also*, *Save our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 338-39 (6th Cir. 2006). If the EA shows that the proposed project will not have a significant effect on human health or the environment, then the Corps issues a "finding of no significant impact" ("FONSI") and an EIS is not necessary under the law. See 33 C.F.R. §230.11; 33 C.F.R. §230.7(a).

In order to define the federal action at issue in this case, and consequently determine the scope of the NEPA review required, the District Engineer must determine the impacts of the

---

[4] A federal action is an action that is subject to federal control and responsibility. 40 C.F.R. §1508.18.

[5] An EA should be concise, and generally won't exceed 15 pages. 33 C.F.R. § 230.10©.

-5-

specific activity requiring the permit, and identify those portions of a broader project over which the District Engineer has sufficient control and responsibility to warrant federal review. 33 C.F.R. Part 325, App. B, §7. b(1). In order to determine whether there are other portions of the broader project (building the coal-to-liquid fuel plant) subject to federal review, the Corps' regulations require the District Engineer to consider several factors including:

(1) whether the regulated activity comprises "merely a link" in a corridor type project (e.g. a transportation or utility transmission project);

(2) whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity;

(3) the extent to which the entire project will be within Corps jurisdiction; and,

(4) the extent of cumulative Federal control and responsibility.

33 C.F.R. Part 325, App. B, §7. b(2). After considering these factors, the ultimate determination comes down to whether or not the federal involvement in the project is sufficient to turn an essentially private action into a federal action; in other words, whether "the cumulative Federal involvement of the Corps and other Federal agencies is sufficient to grant legal control over such additional portions of the project." 33 C.F.R. Part 325, App. B, §7. b(2). Generally, such extended federal involvement arises "where the environmental consequences of the additional portions of the projects are essentially products of Federal financing, assistance, direction, regulation, or approval." *Id.*

In this case, the Corps limited the scope of its review to the filling of the U.S. waters, and did not find that the District Engineer has sufficient control and responsibility to warrant federal review over the entire completed project. (AR 28-29). It further determined that the proposed project (limited to the filling of the U.S. waters) would not have a significant effect on human

-6-

health or the environment; and, it issued a "finding of no significant impact" ("FONSI"). Consequently, no EIS was completed.

The Plaintiffs contend that the Corps erred in limiting the scope of its review to the actual filling of the U.S. Waters, claiming that it should have considered all of the potential environmental aspects of the construction and operation of the entire plant. They do not challenge the conclusion that there will be an insufficient amount of federal control and responsibility over the larger project to justify federal review of the entire project taking into consideration the four factors outlined above. Rather they argue that the "specific activity" at issue is the construction and operation of the proposed facility, not just the filling of a relatively small area of United States waters that are subject to Section 404 of the Clean Water Act ("CWA"), as argued by the Defendants. In support of this contention, Plaintiffs cite to *Stewart v. Potts*, 996 F. Supp. 668, 681-83 (S.D. Tex. 1998), which found that the clearing of 115 acres of forest for a golf course was "part of the same federal activity" as the filling of two acres of wetlands within that forest. That court observed that cases limiting the Corp's jurisdiction to specific minor portions of larger projects usually involved activities involving federal waters that " were physically, functionally, and logically separable from the activities not subject to NEPA analysis." *Id.*

First of all, Plaintiff mistakenly assumes that the Corps' jurisdiction may be expanded without regard to the requirements set forth in 33 C.F.R. Part 325, App. B, §7. b. The "specific activity" for which a permit was sought was, without question, the filling in of 5,897 linear feet of streams and 0.17 acres of wetlands and temporarily impacting 793 linear feet of streams and 0.02 acres of wetlands on or near the proposed construction site for the plant. It was not the

construction and operation of the entire facility. In order to expand its jurisdiction to other portions of the project, the Corps would have had to have found that "the cumulative Federal involvement of the Corps and other Federal agencies is sufficient to grant legal control over such additional portions of the project." 33 C.F.R. Part 325, App. B, §7. b(2). In order to make such a determination, the Corps would have had to have found that the four factors set forth in 33 C.F.R. Part 325, App. B, §7. b(2) weighed in favor of expanding its jurisdiction, not only over the entire construction project, but over all future operations of the facility. *Stewart* did not undercut the need for this analysis, and Plaintiffs have provided no argument that the Corps improperly performed this analysis.

*Stewart* is clearly distinguishable from the case at hand. In *Stewart*, the court held that filling wetlands that were widespread throughout a forest, was part and parcel of clearing the forest for purposes of making a golf course. It found that the effects of filling the wetlands and the effects of clearing the forest were utterly inseparable and, therefore, the two activities were essentially the same for purposes of the permitting process. Consequently, the court held that the effect of fragmentation of the forest should have been included in the scope of the Corps' review. *Stewart* did not say that because filing wetlands was necessary to build the golf course, all construction and future operations associated with the golf course were now subject to federal review.

The construction and operation of a coal-to-liquid fuel plant is physically, functionally, and logically separable from the filling and/or impacting a relatively small area of United States waters, which happen to lay under or near the proposed construction site. The effects of the facility's operations are clearly separate and distinguishable from the effects of filling the

-8-

wetlands which were the subject of the permit request. The relationship between filling a few areas of wetland, largely located around the edges of a a proposed construction site and the long term operations of the facility which will be built upon that land cannot be compared to the relationship that existed between the wetlands and the forest at issue in *Stewart*.

*Stewart* itself distinguished several cases which are much more relevant to the facts of this case, and which contradict the Plaintiff's position on this issue. For example, in *Sylvester v. United States Army Corps of Eng'rs*, 884 F.2d 394 (9th Cir. 1989), the court held that the filling of wetlands necessary to build a golf course for a proposed resort should be limited to the affected area containing the wetlands and should not expand to the entire resort. Defendants also cite several other cases in support of their position that the filling of the wetlands is severable from the construction and operation of the facility, even if construction could not otherwise occur. The Court finds these cases to be more on point and more persuasive than those cases presented by the Plaintiffs. *See, e.g., Ohio Valley Envtl. Coal v. Aracoma Coal Co.*, 556 F.3d 177, 194-97 (4th Cir. 2009); *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105 (9th Cir. 2000); *Sierra Club v. United States Army Corps of Engineers*, 450 F. Supp. 2d 503 (D.N.J. 2006), vacated as moot and remanded, 277 Fed. Appx. 170 (3rd Cir. 2008); see also, *Dep't of Transp. V. Pub. Citizen*, 541 U.S. 752, 767 (2004)(rejecting the simplistic "but for" test the Plaintiffs in this case assert).

Based on the available case law, and the requirements set forth in the administrative regulations associated with NEPA, this Court finds that the Corp's decision to limit the scope of its analysis to the waters subject to the Clean Water Act (i.e., the "specified activity") is entitled to deference and is clearly not arbitrary and capricious. Because the Corps legitimately

concluded that it's scope was limited to the specific activity of filling the U.S. waters on the construction site, it was not required to prepare and EIS to assess the potential impacts of the Applicant's final facility relative to global warming, or any of the other issues arising solely from the eventual operation of the facility.  Plaintiffs make no argument that the Corps failed to adequately address the impacts (direct, indirect or cumulative) stemming from the specified activity (filling in 5,897 linear feet of streams and 0.17 acres of wetlands" or from temporarily impacting 793 linear feet of streams and 0.02 acres of wetlands).  Therefore, Plaintiffs' claim that the Corps violated NEPA is unfounded.

Plaintiffs also argue that even if the Corps correctly limited the original scope of its review, it was bound, pursuant to 33 C.F.R.  Pt. 325, App. B § 7(b)(3),  to equally weigh and consider the possible long term environmental consequences of the plant's operation because the Corp's Combined Decision Document ("CDD") discussed the possible long term benefits of the plant's operation.[6]   Although the regulations involving the public interest review required for all Department of Army permits do indeed provide that "[i]n all cases, the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal," the potentially beneficially impacts of the facility's operations were not considered in the NEPA determination as to the scope of the federal action.  They were considered only in connection with the public interest review required for all Department of Army permits.  This argument, will, therefore, be discussed in the section addressing Plaintiffs' CWA and APA claims below.

---

[6]

**II. <u>Alleged Violations of the Administrative Procedures Act and the Clean Water Act</u>**

Plaintiffs claim that the Corps' public interest review of the CWA permit application was impermissibly skewed because the Corps' cited positive benefits expected to arise from the operations of the facility, but did not address the facility operations's potentially negative impacts on the environment.  Although the Corps properly limited its review to the specified action of filling or otherwise affecting the U.S. waters involved in the construction, in appropriate circumstances, the Corps may include some discussion of an overall project in order to make the required determination that the permit is "not contrary to public interest."  33 C.F.R. §320.4(a)(1).

The public interest review requires to the Corps to consider whether the permitted activity will serve any beneficial purpose.  This does not mean that all possible risks and benefits of the resulting project and its future operations must be weighed, considered, and judged by the Corps.  It was sufficient and reasonable for the Corps to note that filling these particular waters would, in and of itself, have a negligible effect on the environment and human use of the United States waters, and yet would allow a project to go forward in a location that would benefit from the jobs and economic advantages of hosting the facility.  The Corps does not have the power or the responsibility to determine whether a coal-to-liquid fuel plant is a desirable or environmentally friendly means of achieving new energy production; it does have the power and responsibility to determine whether such a facility should be allowed to be built on a site that requires the filling of U.S. waters.  The CDD very thoroughly and thoughtfully addressed the issue that the Corps had the power to decide.  It considered a wide variety of environmental issues that could arise from the filling of the wetland areas; it formulated alternatives and requirements that would

significantly reduce the impact on U.S. Waters; and, it made a well reasoned and well informed decision to grant the permit, allowing the facility to be built at that particular location.

Further, the Corp's CDD appears to have addressed all of the evidence presented through the application process and during the public hearings. The benefits of the overall project were throughly discussed in those materials and proceedings. Plaintiffs and their members had several opportunities to provide concrete evidence that those benefits were overshadowed by potentially negative environmental impacts, and to have that evidence considered by the Corps in their final decision (to the degree that it was relevant); however, they failed to do so. AR 57-60. Therefore, any omission by the Corps with regard to these claims is not arbitrary and capricious, as there is no indication that they were in possession of reliable evidence that the potentially adverse environmental consequences suggested by the Plaintiffs would be likely to occur, let alone that they would outweigh the potential benefits.

Further, contrary to the claims of the Plaintiffs, the Corps was under no obligation to conduct independent studies or to independently verify the information and conclusions set forth in the Boardman report. The Boardman report was prepared by a scientist from the Idaho National Laboratory, part of the U.S. Department of Energy, and not by the applicant. AR 75. There is no need for the Corps to verify information provided by other federal agencies which are expert in their field. *See, e.g., Stop the Pipeline v. White*, 223 F.Supp. 2d 957, 967-68 (S.D. Ohio 2002). In addition, the Corps is allowed to rely on evidence submitted by the applicant absent "particularized objections to the material." *See, Hoosier Envtl. Council, Inc., v. U.S. Army Corps of Eng'rs*, 105 F. Supp. 2d 953, 993 (S.D. Ind. 2000)(citations omitted). Though some general concerns about the overarching project were expressed during the public comment period, no

-12-

particularized objections were made to the information and evidence relied upon by the Corps in its determination.  AR 57-59.  The Corps clearly considered all of the evidence properly before it, (including reports and information cited by Plaintiffs in support of their motion), even if it did not interpret that information in a manner consistent with the Plaintiffs beliefs and interpretations.

The Corps' decision to issue a FONSI seems technically correct based on the evidence that was before it, and wholly appropriate in light of the limited scope of its authority in this instance.  However, even if this Court did not find the decision to be correct under all of the circumstances, applying the highly deferential standard of review that the Corps' decision must be afforded, a Court must presume the validity of agency actions, unless it finds that the decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.5 U.S.C. §706(2)(A); see also, *Michigan v. Thomas*, 805 F.2d 176, 181-182 (6th Cir. 1986); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).    Thus, even if the Corps should have given more weight to potential negative environmental effects of the facility's operations, as suggested by the Plaintiffs, this Court cannot say that the Corps "entirely failed to consider an important aspect of the problem" or that it "offered an explanation for its decision that runs counter to the evidence before the agency."  *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*, 463 U.S. 29, 43 (1983).  Rather, it appears that the Corps "considered the relevant factors and articulated a rational connection between the facts found and the choice made."  *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983).   The Corps' decision, must, therefore, be affirmed.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment (ECF #19) is DENIED, and Defendants' Motion for Summary Judgment (ECF #21) is GRANTED.  Plaintiffs' claims are, hereby, dismissed.  IT IS SO ORDERED.


      /s/ Donald C. Nugent
     DONALD C. NUGENT
     United States District Judge


DATED:  March 30, 2010